**MERRITT–CHAPMAN & SCOTT CORPORATION**

**v.**

**The UNITED STATES.**

**No. 89–64.**

United States Court of Claims.

Jan. 28, 1976.

Bruce C. Mayor, Hartford, Conn., for plaintiff. Martin S. Michelson, Hartford, Conn., atty. of record.

Rex E. Lee, Asst. Atty. Gen., Washington, D.C., for defendant. Susan M. Linden, Washington, D.C., of counsel.

Before SKELTON, NICHOLS and KUNZIG, Judges.

NICHOLS, Judge.

This case comes before the court on defendant's request, filed April 18, 1975, for review by the court of Trial Judge Louis Spector's recommended decision of February 5, 1975. The case has a long and detailed history, having already occasioned five Corps of Engineers Board of Contract Appeals decisions, two recommended trial judge opinions, and one decision by this court, 439 F.2d 185, 194 Ct.Cl. 461 (1971).

In an experiment sponsored by the American Bar Association and the Federal Judicial Center, and assented to by all parties concerned, the above named panel, sitting in Washington, D.C., heard oral argument delivered by counsel in New York, New York, using "Picturephone" facilities provided by the American Telephone & Telegraph Company. The facilities did their part and it is now up to us to do ours.

## I.

The contract out of which this case arose was between Savin Construction Corporation, wholly-owned subsidiary and predecessor in interest of plaintiff, and the United States Government, acting through the Army Corps of Engineers, for the construction of the New Cumberland Locks and Dam on the Ohio River. Twin locks were to be built, involving the construction of 3 lock walls. An existing highway, Ohio State Highway No. 7, ran directly over the specified location of the middle lock wall for about three-fourths of its length. Defendant as part of its obligation to furnish the construction site, contracted with the State of Ohio to relocate the 2-mile section of State Highway No. 7. Defendant agreed to construct the subgrade for the relocated highway along a new alignment, following which the State Highway Department would have the permanent road placed. Once the new Highway No. 7 was opened to traffic, the State would turn the existing Highway No. 7 over to defendant so that plaintiff could excavate it in furtherance of the lock and dam project.

Accordingly, in March 1955, the defendant entered into two contracts for the construction of the subgrade, scheduled for completion as of October 1, 1955.

Plaintiff had been awarded the contract on October 24, 1955. The contract provided that plaintiff could not remove any part of existing State Highway No. 7 "until the relocated highway is opened to traffic, which will be about 1 December 1955." Further, plaintiff was instructed that disposal operations had to be completed by May 1, 1956. (This was due to a contract between defendant and Ohio Edison Company, permitting defendant to use adjacent Ohio Edison land to dispose of the excavated material as long as the disposal was terminated by May 1, 1956).

On November 4, 1955, plaintiff received Notice to Proceed and thereupon mobilized its men and equipment to initiate excavation. The construction of the cofferdam and pouring the concrete structures within the cofferdam area depended on the excavation being completed. Existing Highway No. 7 was not in fact made available to plaintiff on De-

cember 1, 1955, as the contract provided, but instead on April 14, 1956. The Government did not issue a formal suspension order suspending the work as it could and should have done under the Suspension of Work Clause and therefore plaintiff maintained its men and equipment in a state of readiness.

Plaintiff filed a formal claim with the Contracting Officer for the monetary consequences of defendant's failure to provide old Route 7 on time. The claim was denied and plaintiff appealed to the Corps of Engineers Board of Contract Appeals under the Disputes and the Suspension of Work Clauses.

It should be noted that the issue has always been a partial, not a complete suspension of work, and any reference to suspension hereinafter means this. Plaintiff described its damages allegedly resulting from the Government's partial suspension of work in failing to turn the site over in time as follows:

*First.* Increased excavation costs were incurred because the Government required the contractor to excavate in an area between the old and new Routes 7, a narrow, restricted confined and unproductive area. The V-shaped excavation, which narrowed as it deepened because of the slope requirements, acted as a trap for rain and ground water, aggravating excavation problems.

*Second.* Increased costs, such as idled equipment costs, were incurred because the Government did not issue a formal order suspending work, thus plaintiff was obligated to maintain its men and equipment in a state of readiness.

*Third.* Increased costs were incurred because of an overall delay to the project.

The Board, on December 10, 1963, determined that the Government did partially suspend the contractor's operations for 18 days and remanded the case to the contracting officer to consider quantum. Eng. BCA No. 2126 (1963). On plaintiff's motion for reconsideration, the Board found that the Government's partial suspension "unreasonably delayed

the contractor to some extent between January and 14 April 1956." Eng. BCA No. 2126 (1964). A third opinion was issued denying the Government's request for reconsideration. Thereafter on March 14, 1968, the Board determined that plaintiff had not shown any damage. Eng. BCA No. 2675, 68–1 BCA ¶ 6935. Plaintiff appealed to this court and we issued a decision on March 19, 1971, remanding the case to the Board to determine "the existence or the amount of damages." 439 F.2d at 194, 194 Ct.Cl. at 476. We specifically noted that "we do not make any determination on the substantive merits of the claim." 439 F.2d at 186, 194 Ct.Cl. at 464. Thus our remand was broader than a remand only to determine quantum.

Several aspects of our prior decision bear repeating in light of the Board's fifth decision. We held that the Government's failure to hand over the existing highway to plaintiff on the specified date resulted in effect to a partial suspension of work by the Government, actionable under the Suspension of Work Clause quoted *infra*. Plaintiff was denied access to a necessary part of the work site. The lack of a formal suspension order did not make the suspension any the less effective under the doctrine of Constructive Suspensions. Once it is determined that there was a partial suspension of work for the convenience of the Government, two separate questions emerge: 1st, did the suspension delay the work for an unreasonable length of time, and 2nd, if so, did this unreasonable delay cause additional expense or loss, and in what amount (quantum). We remanded the case because we thought that the Board "rolled all these questions into one," 439 F.2d at 192, 194 Ct.Cl. at 474, however we did determine that the suspension lasted from December 1, 1955, until at least April 14, 1956, and this delay was unreasonably. long. The Board was instructed to allow both parties to present further evidence and to consider whether the unreasonable delay caused any additional expense or loss to the contractor, and if so, in what

amount. We did not determine whether the contractor had in fact been harmed by the delay but stated, "it is not out of place to say that prima facie it does seem that a delay of four-and-one-half months, in the circumstances thus far revealed by the record, would probably lead to some harm to this contractor. It may be that, for various reasons, plaintiff suffered no detriment at all from the withholding of Highway No. 7 for this long period, but, as of now, we do not see that conclusion as either clear or certain." 431 F.2d at 194, 194 Ct.Cl. at 476. The unresolved issues then were whether the admittedly unreasonable delay harmed the contractor thus entitling him to relief under the Suspension of Work Clause, and if so, in what amount. The Board had to determine entitlement, a liability question, and then quantum, a damage question. It would seem that the "prima facie" appearance of harm would have to be overcome by new evidence if the Board were to find there was no harm.

The Board held a hearing on December 14, 1971, to allow both parties to present further evidence. Mr. Robert J. Jenks, a key witness for plaintiff at the prior hearings, testified. Plaintiff also called Mr. James S. Clark, Assistant Secretary of Merritt-Chapman & Scott, to the stand in order to introduce a December 31, 1967, Financial Statement. The parties filed briefs presenting further arguments to the Board. Thereafter, the Board, in its fifth decision, noting that "no new facts of evidence" had been presented, held that the contractor had not demonstrated that his operations "were adversely affected by the withholding of the road during that period." The Board found that since plaintiff did not construct an underpass, which was an essential part of the contractor's plan to dispose of the excavated material once the new highway was completed until February 8, 1956, the Government could not be charged for the delay from December 1955 through February 1956. Further, the Board concluded that the contractor's operations were at a stand-

still from the end of January to May 1956 because of unusually wet weather during that period. The Board in essence held that the Government's suspension did not cause plaintiff any additional costs because even if the road had been transferred to plaintiff, the plaintiff would have been delayed by other factors. Eng. BCA No. 2675, 72–2 BCA ¶ 9620.

Plaintiff appealed again to this court and on February 2, 1975, Trial Judge Spector issued a recommended decision. The trial judge concluded that the Government's constructive partial suspension was the proximate cause of increased costs and that plaintiff was therefore entitled to an equitable adjustment in contract price under the Suspension of Work Clause. We agree and hold the contrary Board finding lacks support of substantial evidence. The trial judge went on to determine quantum because he felt that "justice requires that the court proceed with review of * * * [the Board's] conclusion [that plaintiff did not suffer any damage as a result of the suspension] particularly in this instance where the record has been fully developed and where there have been five prior decisions of the board * * " Trial judge's report at 22. For the reasons discussed in Part III, we believe the trial judge is in error on this point and we remand the case to the Board for a determination of quantum. For clarity, it should be noted that the Board decision is the one we have legally before us for review.

## II.

 The Suspension of Work Clause necessitates an inquiry as to whether an unreasonable delay, occasioned by the Government, caused a contractor any additional expense or loss. We stress the word "any". This is as we viewed it previously, initially not a quantum question but an issue of entitlement to relief under the contract clause. If it is answered affirmatively, then a quantum determination follows. The trial judge phrased the issue as one of proximate

**1396**

causation, for if the delay did not harm the contractor, he would not be entitled to recover.

The Suspension of Work Clause has an interesting history. It was first drafted during World War II as an outgrowth of agitation following the Supreme Court decision in *Rice v. United States*, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), and thereafter was used by the Army Corps of Engineers as a standard provision in fixed price construction contracts. The Court in *Rice* held that because of the "Changes," "Changed Conditions," and "Delays-Damages" clause in the contract, a contractor's exclusive remedy for a Government caused delay was a time extension. The Suspension of Work Clause provided that a time extension was not the only remedy available to a contractor, but that he could seek an equitable adjustment in contract price for any additional expense or loss caused by the Government's unreasonable delay not due to the contractor's own fault or negligence.

The Clause at issue reads in pertinent part as follows:

\* \* \* The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. \* \* \*

The Clause was used by some but not all military and civilian agencies throughout the 1940's and 1950's; however, it was not a mandatory Clause and until 1960, there was no prescribed uniform language. In 1950, a Government-wide effort to draft a standard Suspension of Work Clause failed as did a 1953 attempt by the Associated General Contractors to have such a Clause included in the Armed Services Procurement Regulations (ASPR). In 1955, the Navy recommended the adoption of a Suspension of Work Clause to the ASPR Committee. Although the Committee favored the idea, no action was taken and the matter was referred to a Government Task Force which had been established to unify Government procurement procedures. The Task Force established a Study Group which took testimony and solicited opinions from numerous Government Agencies. In April 1958, the Study Group recommended a Suspension Clause for mandatory use throughout the Government. Clarke, *Government-Caused Delays In The Performance Of Federal Contracts: The Impact Of The Contract Clauses*, 22 Mil.L.Rev. 1, 27–37 (1963). After receipt of comments, some changes in wording were made and the Clause, entitled "Price Adjustment For Suspension, Delay Or Interruption of the Work" was published in the Federal Register as an "Additional Standardized Clause" to be inserted in Government contracts whenever "desired to provide for suspension of the work for the convenience of the Government and/or to provide for administrative relief for unreasonable periods of delay caused by the contracting officer in the administration of the contract." 25 Fed.Reg. 648 (1960). Thus the Clause was not mandatory, however, if an agency opted to use a Suspension of Work Clause it had to use the form as prescribed in the Federal Procurement Regulations, 41 C.F.R. § 1–7.602–1 (1961), ASPR 7–604–3 (Nov. 1961).

The 1960 Clause is similar to the Clause used in the Merritt-Chapman & Scott contract in that it allows an adjustment for any increase in the cost of performance of the contract "necessarily caused by the unreasonable period of such \* \* \* delay". However, it is

more explicit in that it further provides that:

No adjustment shall be made to the extent that performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed or interrupted.

(In 1968, the Clause became a required provision in all Government fixed price contracts. The name of the Clause was changed back to "Suspension of Work" Clause, however it remained in essentially the same form as the 1960 Clause. The 1968 version is used currently. ASPR 7–602.46; Federal Procurement Regulations 41 C.F.R. § 1–7.601–4).

The parties have not provided the court with a copy of the Study Group's recommendations or any pertinent ASPR Committee Minutes and we have not been able to locate a published text of the Study Group Final Report which might explain the reason the language of the Clause was changed in 1960. Therefore, we can only surmise as to the drafters' purpose in adding the provision quoted above to the 1960 Clause.

The pre-1960 Clause allowed a contractor to recover damages due to a Government caused delay not resulting from a contractor's own negligence or fault. It did not transfer all risks incident to delays not due to the fault or negligence of the contractor to the Government, as it has been interpreted to deny recovery for delays not attributable to the Government. *John A. Johnson & Sons, Inc. v. United States*, 180 Ct.Cl. 969 (1967); *Flippin Materials Co. v. United States*, 312 F.2d 408, 160 Ct.Cl. 357 (1963); *Ozark Dam Constructors v. United States*, 288 F.2d 913, 153 Ct.Cl. 120 (1961). A situation might arise, however, where the Government suspends operations for its own convenience while at the same time, the contractor is prevented from working by other causes. This can be analyzed in terms of concurrent causation. A contractor might be delayed by reason of two concurrent causes (that is, the Government's action or inaction and some other factor), each

of which would have independently produced the delay during the same time period but neither of which supersedes the other as the dominant cause of the delay. The pre-1960 Suspension of Work Clause does not, by its language, bar recovery because a contractor would have been prevented by other causes from performing its work when the Government's actions did in fact cause its damage. The Clause does not mention any consideration of concurrent causation in determining entitlement and this gap may have prompted the redrafting of the Clause in 1960.

The 1960 Clause seems specifically to preclude recovery if the contractor would have been equally delayed by other concurrent causes regardless of the Government's action or inaction. The Clause prevents any allocation of damages because it in effect determines that a contractor is not *entitled* to any recovery. It should be noted that the Clause does not weigh whether the Government's action is of less importance than the concurrent cause or whether the concurrent factor is a superseding action. Under the 1960 Clause, a contractor would be entitled to recovery only if the Government's delay is the sole proximate cause of the contractor's additional loss and only if the contractor would not have been delayed for any other reason during that period.

■ The pre-1960 Clause used here is not as specific as the 1960 version. The Board, in denying that plaintiff was entitled to an equitable adjustment because of the lack of an underpass and the severe rains, read a sentence into the contract which was not in the pre-1960 Clause. The question to be resolved is whether the Government's action or inaction caused the contractor additional expense or loss. The fact that something else *might have caused* the contractor to be delayed is not relevant in this inquiry. Only if it is determined that the contractor did not suffer any additional loss due to the Government's delay but that it was injured by some other superseding intervening cause,

would plaintiff not be entitled to recovery. A contractor is entitled to recover, under the pre-1960 Clause if the Government's delay is the proximate cause of the contractor's additional loss, even if some other occurrence might have hypothetically caused a like delay during that time. A contractor would be denied recovery here only if it could be shown that the Government's delay did not cause the additional loss because some other factor caused the loss independent of the Government's actions.

■ Therefore, we must examine the factors the Board concluded caused delay to the plaintiff, to determine whether they, or the non-delivery of Highway No. 7, were legally the cause of the delay. We deal with uncontroverted facts, except where stated, and therefore can make our own findings. *S. S. Mullen, Inc. v. United States*, 389 F.2d 390, 182 Ct.Cl. 1 (1968).

■ The first of these factors involved an underpass. The underpass was required because the jobsite was on one side of the proposed new Route 7 while the disposal area was on the other. Because it had been contemplated that traffic would be on the new Route 7 after December 1, 1955, and plaintiff was not permitted to cross Route 7 at grade, disposal was to be accomplished using an underpass. The underpass was not completed until February 8, 1956, and therefore the Board concluded that the first two months of the partial work suspension was caused by the absence of an underpass. However, there was no reason for plaintiff to complete the underpass any sooner. The new highway was not opened to traffic until April 14, 1956, at which time the underpass was complete. Even after that time, plaintiff was able to cross the new Route 7 at grade.

It cannot be said that the lack of an underpass was a legal or superseding cause of the delay during that two month period. Defendant, in its request for review, says the Government should be liable only if the contractor as a matter of fact would have progressed on schedule but for the suspension, but, if the contractor would have been delayed anyway, then there is no liability. This analysis would be more appropriate if we were confronted with the 1960 Clause. In response to plaintiff's contention that it would have taken only three to four days to build the underpass under pressure, defendant offers conflicting evidence. This is mere speculation and not relevant to the inquiry here. We do not know how long it would have taken plaintiff to build the underpass had it been under pressure to do so and the answer is not really knowable. We know that to some extent plaintiff was able to cross new Route 7 at grade even after it was opened. We do know that the underpass was ready well before it was needed. We do know that from December 1955 until April 1956 defendant failed to make the roadway available to plaintiff, whereas the possible effect of the underpass not being ready when new Route 7 came into use is the merest speculation. The lack of an underpass during the first two months does not negate the fact that defendant's delay caused plaintiff to incur additional expense, thus entitling it to relief under the language of the Suspension of Work Clause. The Board's contrary opinion is based on conjecture which is unacceptable under basic principles of proximate causation. The Board's conclusion that the first two months of the partial suspension was caused by the absence of an underpass, not by the Government, is incorrect as a matter of law. We hold that plaintiff is entitled to recovery for the two month period under the Suspension of Work Clause.

■ The second factor considered by the Board was the abnormal rainfall during the latter two month period of the partial suspension. Defendant shows the whole site was a hopeless quagmire. The Board reasoned that plaintiff would not have been able to work during that period regardless of the Government's delay. This conclusion suffers from the same defects in analysis as discussed above. To determine entitlement, we

must consider only whether the Government's delay caused some additional loss or expense. The issue of how much is for quantum. The suspension constructively began on December 1, 1955, and continued until April 1956. The rains certainly did not lift the suspension, and instead enhanced the injury. The Government's constructive suspension was the proximate cause of some additional costs to plaintiff.

Though the Board's reasoning is not spelled out, we may take it to be that the contractor, given timely delivery of old Highway No. 7, would have been paralyzed still by heavy rains and resultant quagmire conditions from the end of January to the beginning of May 1956, with heavy loss to which the assuagement of a Suspension of Work claim would have been wholly unavailable. But this assumes a situation that did not occur in the real world, and the Board needed the 1960 version of the Clause to sustain it. In the real world plaintiff entered this rainy period already much behind, and needing to catch up, because of the partial constructive suspension in effect since December 1. Yet because of receiving no express suspension, it had its men and equipment mobilized at the site to no useful purpose. Thus the rain magnified the injury. Plaintiff is entitled to recover compensation beyond the injury caused by delay when, as here, the refusal of an express suspension also caused injury and cost. A constructive suspension may thus result in demonstrable injury that an express suspension would avoid. The Board has failed to advert to this and again has applied the wrong concept of causation.

### III.

 Once it is determined that a contractor is entitled to recovery, the amount of the "additional expense or loss" must be resolved for an equitable adjustment. The trial judge concluded that the circumstances of this case required that the court determine quantum and proceeded to consider the issues involved in plaintiff's claim. The trial judge was, in our view, in error on this point. In view of the Supreme Court decisions in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), and *United States v. Anthony Grace & Sons*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), we perforce and reluctantly remand the case to the Board for a determination of quantum. Plaintiff urges that this case is one contemplated by the Supreme Court in *Grace* when it stated that resort to administrative procedure would not be required "if it is shown by clear evidence that such procedure is 'inadequate or unavailable.'" 384 U.S. at 430, 86 S.Ct. at 1543. It is true that this case has been pending for a long time. However, we deem that the Board guided by our instructions is the only legal forum to determine quantum. The circumstances that caused the delays here were in a large part attributable to the absurd complexity of Wunderlich Act procedure itself. They cannot be attributed to any special sin or moral obliquity of the Board alone, not shared by the parties. Mere delay is not a cause for deviation from required procedure if it is not blameable directly to defendant's officers.

We did not determine liability or quantum in our prior decision although we did say that "prima facie it does seem that a delay of four-and-one-half months, in the circumstances thus far revealed by the record, would probably lead to some harm to this contractor." 439 F.2d at 194, 194 Ct.Cl. at 476. We are now saying that the partial suspension of work, caused by the Government failing to hand over the road was an unreasonably long delay causing plaintiff some additional expense or loss. The contrary finding is not supported by substantial evidence. Plaintiff is entitled to relief under the Suspension of Work Clause and the Board must determine the appropriate amount of damages. It is unlikely that the Board can determine that plaintiff suffered no damages. The Board will conclude from Part II that we do not consider plaintiff's lack of an underpass to be relevant in determining

damages. Plaintiff did not suffer any additional loss or expense by reason of the underpass. From December 1955 through January 1956, plaintiff was curtailed in its work only because of the Government's constructive partial suspension. Any additional expenses during that period due to delay must be charged to the Government.

The second two month period is somewhat more complicated. The Board compared the costs actually incurred by plaintiff with the costs plaintiff would have incurred had the road been relocated on time and concluded that plaintiff was not harmed by the Government's delay because, had the road been relocated on time, plaintiff would have been forced to work in the rain, or suspend operations on its own. This is not an appropriate standard for determining damages as it demonstrates a lack of understanding of the constructive suspension.

 We have held that the contractor was entitled to a constructive partial suspension for the period of December through April. A partial suspension, resulting from a partial withholding of the work site is not any the less effective for lack of a formal suspension order. As early as 1948, the Corps of Engineers Board of Contract Appeals granted an equitable adjustment for delay under the Suspension of Work Clause where the Government had suspended work for its own convenience, although no formal order had been issued. The Board held that the issue was not what the Contracting Officer had done but what he should have done. *Guerin Bros.*, BCA 1551 (1948). A contracting officer may not deny relief under the Suspension of Work Clause by the mere withholding of his order when the work has in fact been effectively suspended. A constructive suspension has the same effect and consequences as an actual suspension and relief should be granted as if an actual suspension order had been issued. *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 187 Ct.Cl. 15 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164,

26 L.Ed.2d 542 (1970); *Jefferson Const. Co. v. United States*, 368 F.2d 247, 177 Ct.Cl. 581 (1966); *John A. Johnson & Sons, supra.* See also, 2 West's *Federal Practice Manual* § 1602 (1970). Thus, in determining quantum, we must assume that the work had been suspended by the Government from December through April. If the contractor had received a formal order, it would not have had to keep its men and equipment mobilized, at least as to that part of the work area subject to the partial suspension and it would not have had to work during the rainy period. In determining damages, the Board must recognize that the contractor was entitled to a partial suspension order and must compare the contractor's costs if the suspension had granted (then it would not have had to work so much during that period) with those it incurred because the suspension was not granted (thus certainly forcing it to keep its men and equipment mobilized and possibly forcing it to incur greater excavation costs because of the slope problems).

It may be the rain works both ways. To the extent the plaintiff would have had to work even under partial suspension, extra cost occasioned by the rain must be excluded from the quantum of recovery. To the extent a partial suspension would have relieved plaintiff from work it attempted to perform in the rainy season, and would have enabled it to perform instead in a more clement season, the extra rain-induced cost is compensable.

In conclusion, we hold that plaintiff is entitled to an equitable adjustment under the Suspension of Work Clause for the period from December 1, 1955, through April 24, 1956. Accordingly, plaintiff's motion for summary judgment is granted in part and denied in part. Defendant's cross motion for summary judgment is denied. Further proceedings in this court are stayed for six months and we remand the case to the Board to determine the quantum of damages for the period of the partial work suspension, pursuant to Pub.L. 92–

415, and the court's Rule 149(b). Plaintiff's counsel is instructed to advise the court of the status of proceedings at 90-day intervals, pursuant to Rule 149(f).