**BEAUCHAMP CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 408–85C.

United States Claims Court.

March 8, 1988.

Kenneth B. Weckstein, Washington, D.C., for plaintiff; Brian A. Bannon, Epstein, Becker, Borsody & Green, of counsel.

Joseph A. Kijewski, Washington, D.C., with whom was Acting Asst. Atty. Gen. James M. Spears, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

### I. Introduction

On July 11, 1985, Beauchamp Construction Company, Inc. (Beauchamp or plaintiff) filed a complaint in this court challenging the contracting officer's final decision which denied in part Beauchamp's claim for an equitable adjustment of $55,818.45 under the Differing Site Condition clause of its contract with the Department of Justice, Immigration and Naturalization Service (INS or defendant). In this court, plaintiff now seeks $87,430.31 in damages for an alleeged 137–day delay in contract performance due solely to the defective specifications of INS and an admitted differing site condition. Jurisdiction lies under 28 U.S.C. § 1491 and 41 U.S.C. § 609.[1] This opinion addresses plaintiff's motion for *partial* summary judgment seeking an order holding defendant liable for additional delay costs incurred due to the government's defective specifications, the resulting differing site condition, and the delay involved in correcting these specifications and conditions.

Viewing the submissions in the light most favorable to the non-movant defendant, and after oral argument, we grant plaintiff's motion for the reasons detailed below and find defendant liable for any *provable* delay damages suffered by Beauchamp. Inasmuch as the liability and damages issues have been bifurcated, the precise amount of such damages shall be determined at a *separate* trial under RUSCC 42(b).

### II. Facts

The following facts are not disputed by the parties, thus, we find accordingly. On September 30, 1983, INS awarded Beauchamp a fixed-price ($2,879,800) contract (DLS–41–83) for construction and renovation of several buildings at Krome North Service Processing Center in Miami, Florida. As noted in the Invitation For Bids (IFB), the contract contained representations of soil conditions. On that same date, plaintiff received formal notice to proceed with contract performance, and under the contract, plaintiff had 365 days in which to complete the contract. Mobilization, for contract performance, began on October 6, 1983. Thereafter, in mid-October 1983, plaintiff discovered "muck" which is a variant soil condition. "Muck" rendered the soil incapable of supporting a building's foundation, which in turn prevented plaintiff from placing the footings for the medical building (building 10c) and the storage facility (building 12). Also, shortly thereafter, in mid-October 1983, plaintiff advised INS's contracting officer (CO) that actual soil conditions, at the site, differed materially from the depiction(s) in the contract. INS did not issue a written stop-work order, on such noticed condition, even though Beauchamp could not continue with part of the construction of buildings 10c and 12. Plaintiff, nevertheless, continued to perform other contractual tasks such as site preparation (*i.e.*, clearing, grubbing, and excavating) to the extent that the muck was not an impediment. By October 24, 1983, defendant had given new specifications as well as a request for a cost proposal for demucking to Beauchamp since the original specifications did not contemplate the presence of muck. Defendant unequivocally concedes that the presence of muck

---

1. This court finds jurisdiction under both our general jurisdictional statute, 28 U.S.C. § 1491, and the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.*, specifically § 609. Section 609 provides: "[I]n lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court...."

was in fact and in law a differing site condition, and that it halted a part of the work at buildings 10c and 12. Plaintiff responded with its cost proposal for the required demucking work on November 11, 1983; however, notwithstanding the admitted differing site condition, defendant did not authorize payment for plaintiff to proceed with the demucking work until it issued a telegram on January 6, 1984, which was almost three months after it was notified of the existence of the muck. Modification Number 4, authorizing the demucking, was issued by INS on January 16, 1984, effective January 6, 1984. This modification authorized payment of plaintiff's *direct* costs for the demucking.[2] Plaintiff was only paid $63,697.44 for such work. Shortly after formal authorization of the demucking work, plaintiff by letter notified INS that it would make a separate claim for a time extension and "associated costs."

Following the foregoing modification, the contracting officer sent plaintiff a letter on January 17, 1984. In this letter, defendant represented to Beauchamp that it would grant a time extension due to the demucking around building sites 10c and 12 from "the time construction was due to begin ... [to] the date Modification 4 was issued." Further, defendant acknowledged in that same letter that despite the absence of the stop-work order—

> [I]t was obvious that [Beauchamp] could not proceed with the construction of these buildings due to the sub-surface demucking requirement that was *not* established prior to contract award.

(emphasis added). Finally, defendant also unequivocally admitted therein that—

> [C]ontract performance on a *part* of the work was delayed for an *unreasonable* period of time and that an equitable adjustment should be made for any increase in the cost of performance of the Contract (excluding profit) necessarily caused by the *unreasonable* suspension delay and interruption of work.

(emphasis added). At the conclusion of the letter, the contracting officer invited plaintiff to submit a claim for time delay costs including "a separate cost analysis showing the additional project management and superintendence time that will be spent on the project *as a result of the delay in issuing Modification No. 4*" (emphasis added).

After receipt of Modification No. 4 and during the time that Beauchamp was working to alleviate the muck problem surrounding buildings 10c and 12, so that it could continue with the construction of same, the subcontractor that was hauling the muck, *i.e.*, Florida Engineering, experienced a truckers' strike for a period of 19 days from January 24, 1984, to February 14, 1984. Additionally, on February 21, 25, and 27, rain delayed the demucking work. But by March 1, 1984, plaintiff had corrected the muck problem and returned to the original contract performance requirements.

After completing the demucking work on March 1, 1984, thereafter, on March 29, 1984, Beauchamp, followed the directive of the contracting officer in his January 17th letter and submitted a claim for the 137 days for interruption of work and additional indirect expenses in the amount of $55,818.45. Plaintiff later certified its claim, at defendant's request, on May 2, 1984. Notwithstanding the foregoing, on September 24, 1984, INS's contracting officer denied plaintiff's claim *in large part* and authorized only a 54-day time extension (from the effective date of Modification No. 4, January 6, 1984, to the date of demucking completion, March 1, 1984) and $16,489.49 for indirect expenses under the differing site condition clause. Neither a time extension nor indirect costs were allowed for the period of 83 days covering the time from when the differing site condition of muck was discovered (*i.e.*, mid-October 1983) to the time that defendant authorized payment to correct the problem (January 5,

---

**2.** This consisted of removing the muck, peat, and other deleterious materials; disposing of the same; importing fill dirt, spread, and compact same; and performing laboratory and field density testing. A *maximum* amount of $86,125.47 was authorized and allocated for this modification.

1984), all contrary to the contracting officer's unequivocal representations in defendant's letter of January 17, 1984.

### III. *Contentions of the Parties*

#### A. Plaintiff

Plaintiff maintains that defendant is liable to it for an equitable adjustment to the contract price for the total 137 days of unreasonable delay, comprising the entire period from the notification of the differing site condition in October 1983 to its correction on March 1, 1984. In the motion for partial summary judgment, Beauchamp argues, therefore, that (1) it had a right to complete the contract *prior* to the date called for by the contract and that defendant is liable for all delay damages resulting from the differing site condition that frustrated early completion; (2) delays to the completion of building 10c necessarily delayed contract performance because building 10c was the project of the longest duration under the contract; and (3) the differing site condition delayed the construction of building 10c by 137 days. Defendant is, therefore, liable, according to plaintiff, for this entire delay period due to its defective specifications and the emergence of the differing site condition.

#### B. Defendant

Defendant opposes the motion for partial summary judgment seeking to affix liability on it for the alleged 137–day delay by raising four arguments. First, defendant contends that not all the work on building 10c was interrupted due to the muck and that plaintiff was able to continue working on some portion of the building even during the demucking period. Second, even without the 137–day delay, argues defendant, plaintiff would not have completed the contract within the 365 days allowed by the contract, and thus could not have complet-

ed the contract early. Third, INS granted Beauchamp a 54–day extension from the authorization of the work on January 6, 1984, to the accomplishment of demucking on or about March 1, 1984. Fourth, INS points to several concurrent delays for which plaintiff must assume the risk and which allegedly delayed the overall contract performance of plaintiff until February 19, 1985.

### IV. *Issues*

Both parties have agreed that the discovery of the muck in the subsurface around buildings 10c and 12 constituted a differing site condition, and plaintiff has received payment of *direct* costs ($63,-697.44) due to the additional work, a 54–day extension to perform the demucking, and indirect overhead costs ($16,489.49) for the period from January 6, 1984 to March 1, 1984 (*i.e.*, from the date when defendant authorized the actual demucking work to the date when Beauchamp completed the work). The court, therefore, postures the threshold issue underlying plaintiff's motion to be—whether plaintiff is entitled to recover *indirect* costs for the 83–day delay that occurred from the time that Beauchamp notified defendant of the differing site condition to the time that INS issued payment authorization for the demucking work (*i.e.*, from mid-October 1983 to January 5, 1984).[3]

### V. *Discussion*

#### A. Summary Judgment Standard

In ruling on Beauchamp's partial summary judgment motion, it is axiomatic that the court may grant the motion if there is no genuine issue of material fact and provided further that the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In other words, under this standard, the court's threshold determination is

---

**3.** Plaintiff also challenges the adequacy of the amount received (*i.e.*, $16,489.49) from INS for *indirect* costs during the 54–day period when the demucking work was being performed. The reason for such position is that, by such payment, defendant has admitted liability for indirect costs for said 54–day period. Thus, the only issue is the correctness of the rate of pay-

ment at which these indirect costs were calculated, and not whether defendant is liable for any such costs due to delay during that 54–day period. Given the foregoing, the quantum issue regarding indirect costs during the 54–day period will be resolved during the trial phase of this case.

whether there is a material factual issue for trial. The non-movant, in opposing the motion, must provide the court with sufficient creditable evidence in its submission(s) sufficient to generate an actual material factual dispute. *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). In *Sweats Fashions*, the Federal Circuit recently articulated the standard in this court for determining the existence of an actual or genuine factual dispute by stating that: "[a] dispute is *genuine* only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant." *Id.*, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). In meeting this standard, we are admonished that the non-movant may not rest on naked conclusory pleadings to show an actual material issue for trial, but *must* put forth specific evidence probative of the postured fact that could be offered at trial, usually by means of affidavit. *Sweats Fashions*, 833 F.2d at 1562 (citing *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836 (Fed. Cir.1984). The court in *Sweats Fashions* also underscored the following obligation of the moving party in meeting its burden as delineated by the U.S. Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

> [T]he burden is not on the movant to *produce evidence* showing the *absence* of a genuine issue of material fact ... "*[i]nstead*, ... the burden on the moving party may be discharged by ... pointing out ... that *there is an absence of evidence to support the nonmoving party's case.*"

*Sweats Fashions*, 833 F.2d at 1563 (emphasis in original) (citing *Celotex*, 477 U.S. 317, 106 S.Ct. 2548).

With the burden of each party fixed in mind, and to justify the grant of plaintiff's motion, the court must now assure itself that the record at bar postulates no actual dispute regarding any *material fact*, and that the movant is entitled to judgment as a matter of law. With respect to the "materiality" of the facts, the court makes that determination against the same legal standard that it will apply in the case. *Barmag Barmer*, 731 F.2d at 835–36. The court's analysis will first determine whether an issue of fact exists in the record and, if so, then it will assess the genuineness and materiality of any such factual dispute.

### B. Legal Standard For Delay Claims

Plaintiff initially requested partial summary judgment based on its right to complete the contract prior to the required performance date. But in plaintiff's reply memorandum, it apparently abandoned the early completion argument as a basis for defendant's liability for delay. Therein, plaintiff restated its position more succinctly to the effect that the liability of the defendant arose from the admitted differing site condition that unreasonably delayed contract completion, regardless of whether or not there was a likelihood of early completion. With this clarification, the court will therefore not address the early-completion contention.

We further note that Beauchamp points to the delay in the construction of building 10c as critical in causing the delay in the overall contract completion. Reasoning therefrom that if the project requiring the greatest amount of time to complete was government delayed, due to a differing site condition, then the overall contract performance was necessarily unreasonably delayed, thus entitling Beauchamp to summary judgment. However, again, the court must determine that it need not address this argument since under the legal standard relevant to delay, discussed *infra*, an admitted government interruption of *any part* of contract performance is compensable *if* the delay is found to be unreasonable.

Here, the record shows that Beauchamp originally brought its complaint in this court under the Differing Site Condition clause of the contract. This clause functions to relieve the contractor from the financial burden of the risk that the site will actually present more onerous working conditions than those detailed in the government's specifications. Defendant

has unconditionally conceded that a differing site condition existed under the contract. In fact, plaintiff has already received an equitable adjustment under this clause, *i.e.,* Modification No. 12, for the direct costs of performing the demucking work ($63,697.44), for the *indirect* overhead costs ($16,489.49) during that period, and a 54–day extension for the time which Beauchamp actually spent performing the demucking work.

■ Since plaintiff has received an adjustment for 54 days out of the 137 days claimed, then what is it that plaintiff now seeks by this action? What Beauchamp now seeks is a ruling holding the government liable for the *indirect* costs incurred by plaintiff as a result of idleness with regard to being unable to proceed timely with the foundation work surrounding building 10c. This idleness was allegedly directly occasioned by the initial delay of 83 days that defendant took to issue Modification No. 4, which authorized Beauchamp to perform the demucking (mid-October 1983 to January 5, 1984). And, additionally, it seeks indirect costs incurred during the 54–day period over and above the $16,489.49 previously paid. The basis and standard for determining a contractor's entitlement to an equitable adjustment for delay in contract performance, due to acts or omissions of the contracting officer, is found in the Suspension of Work clause of subject contract. This clause is a mandatory component of every fixed-price construction contract, and in pertinent part, it provides:

Suspension of Work

(a) The Contracting Officer may order the Contractor in writing to suspend, delay, or interrupt all or any part of the work for such period of time as he may determine to be appropriate for the convenience of the Government.

(b) If the performance of all or *any part* of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract, *or by his failure to act* within the time specified in this contract (or if no time is specified, within a reasonable time), an adjustment *shall* be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent (1) that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor or (2) for which an equitable adjustment is provided for or excluded under any other provision of this contract.

(emphasis added).

■ Inclusion of the word "shall" in the quoted language, *supra,* compels us to hold that the clause imposes a mandatory obligation upon the government to give the contractor an equitable adjustment for any increase in the cost of performance that arises from either (1) an *express* written order from the contracting officer suspending, delaying, or interrupting all or any part of the contract work or (2) a *constructive suspension* resulting from an act or omission by the contracting officer that delays, suspends, or interrupts all or *any part* of the contract performance for an *unreasonable* period of time. A constructive suspension, *as here,* results when performance is *effectively* suspended or delayed, but the contracting officer has failed or declined to issue a stop-work order. In such case, "the law considers that done which ought to have been done" and deems such delay to constitute a constructive or *de facto* suspension. *Merritt–Chapman & Scott Corp. v. United States,* 192 Ct.Cl. 848, 870, 429 F.2d 431, 443 (1970).

■ Primarily, the function of the Suspension of Work clause is to provide a contractual basis for compensating the contractor for *government-caused* delays of an unreasonable duration. *John A. Johnson & Sons v. United States,* 180 Ct.Cl. 969 (1967). An additional reason for the clause is that it clearly supports the policy that the contractor is entitled to other rem-

edies besides a time extension for such government-caused delays. *Chaney and James Construction Co. v. United States*, 190 Ct.Cl. 699, 706, 421 F.2d 728, 731 (1970). The clause is qualified, however, in that the adjustment for compensable delay is unavailable to the contractor to the extent that other causes, attributable to said contractor, would have simultaneously suspended, delayed, or interrupted contract performance. Thus, under the application of the constructive suspension clause, an *express* order to suspend the work is not a necessary imperative to entitle the contractor to receive an adjustment for a constructive suspension. In short, the court may treat the contractor's claim as one brought under the Suspension of Work clause where the acts of the contracting officer unreasonably delay the contractor's progress in performance and cause the contractor to incur additional expense. *Johnson & Sons*, 180 Ct.Cl. at 984. For example, in *Johnson & Sons*, plaintiff received a building construction contract but the government delayed plaintiff's access to the site for its own convenience despite its representations that the contractor would have priority of access. The contractor brought its claim under the Disputes clause of the contract; however, the court treated said claim as if it were made under the Suspension of Work clause. *Id.* That is to say, even though the contracting officer did not formally issue a suspension of work order, the court found a compensable constructive suspension of the work. *Id.* at 991.

In *T.C. Bateson Construction Co. v. United States*, 162 Ct.Cl. 145, 187, 319 F.2d 135, 160 (1963), the court similarly held that when the government's actions caused delay and additional expense to the contractor, the contracting officer should have suspended the work *via* an express stopwork order. There, the government employed civil service employees with a view towards saving costs on a part of the project, notwithstanding its knowledge that such a choice would precipitate a work stoppage on the entire project due to union demands that only union labor be employed.

In order for a contractor to recover under the constructive suspension provision of the Suspension of Work clause, he must show (1) that the delays or extra expenses were *directly* caused by the actions of the government; (2) that the delay was for an *unreasonable* period of time; and (3) that the delay occasioned injury to the contractor in the form of additional expense or loss. *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956 (1966). Relative to proving that the delay was *directly* caused by the government, the contractor must concomitantly show that it was not delayed by any concurrent cause that would have independently generated the delay during the same time period even if it does not predominate over the government's action as the cause of the delay. *John McShain, Inc. v. United States*, 188 Ct.Cl. 830, 412 F.2d 1281 (1969); *see also Merritt–Chapman & Scott Corp. v. United States*, 208 Ct.Cl. 639, 528 F.2d 1392 (1976). In that connection, the Suspension of Work clause states that any concurrent cause that would have equally delayed performance bars recovery under the clause regardless of the government's actions. *Merritt–Chapman*, 208 Ct.Cl. at 650, 528 F.2d at 1397–98. Thus, the court in *Merritt–Chapman* teaches that the contractor would be entitled to an adjustment under said clause "only if the Government's delay was the sole proximate cause of the contractor's additional loss and only if the contractor would not have been delayed for any other reason *during that period*." *Id.* (emphasis added).

C. Application Of The Standard Under The Suspension Of Work Clause

Since Beauchamp seeks compensation for a delay in part of the contract performance due to the contracting officer's failure to authorize the demucking within a reasonable time, the court deems plaintiff's claim to have been brought under the Suspension of Work clause. In meeting its burden of showing a constructive suspension under the Suspension of Work clause, Beauchamp first argues that the 83–day period of delay (mid-October

1983 to January 5, 1984), prior to the issuance of the authorization to correct the muck problem, resulted solely from the government's original construction specifications that were defective in that they did not depict the existence of muck surrounding the foundation area of buildings 10c and 12. The parties agree that Beauchamp could not proceed with the construction of a part of the foundation of either building until the government redesigned its specifications to take into account the discovery and the amelioration of the differing site condition. Corroborative of its position, plaintiff next points to defendant's letter of January 17, 1984, to prove that defendant was totally responsible for the unreasonable delay. The contracting officer admitted in said letter that even though he did not issue a stop-work order for the buildings, construction was necessarily suspended due to the correction of the differing site condition of sub-surface muck. Additionally, the contracting officer accepted the responsibility for the delay and characterized it as "the delay in issuing Modification No. 4." Particularly illuminating is his candid assertion that:

> ... it was obvious that you could not proceed with the construction of these buildings due to the sub-surface demucking requirement that was not established prior to contract award.

In that same letter, the contracting officer went on to admit that contract performance on a part of the work was delayed for an unreasonable period of time and that an equitable adjustment should be made for any increased costs caused by the "unreasonable suspension delay and interruption of work." Plaintiff relies on this admission, and because we find that it is unequivocal and unambiguous, it meets and carries plaintiff's burden of establishing unreasonable delay. Additionally, case law in the predecessor Court of Claims, which is binding here, has held that the entire period of delay resulting from the government's defective specifications is *per se* unreasonable. *Chaney and James Construction Co. v. United States*, 190 Ct.Cl. 699, 421 F.2d 728 (1970). In *Chaney*, the construction contractor sought delay compensation under the Suspension of Work clause due to defective government specifications. The agency board had denied the contractor's claim because the changes to the specifications issued by the government to correct the defects did not delay *overall* performance progress. But the court reversed and held (1) that when delay is caused by defective specifications, the entire period of delay is unreasonable; (2) that the contractor is entitled to recover all provable delay damages that resulted from defective specifications; (3) that the Suspension of Work clause provides an alternative administrative remedy to a breach of contract claim based on the defective specifications; and (4) that the Suspension of Work clause states that delay to *any part* of the performance is compensable. Consequently, the overall contract performance does not have to be delayed to entitle the contractor to damages. 190 Ct.Cl. at 707, 713, 421 F.2d at 731, 732.

Under *Chaney*, therefore, if defective specifications are the genesis of the delay, the contractor does not have to affirmatively prove that the time period of the delay was unreasonable since the contract clause serves as an administrative alternative to a breach claim for defective specifications. The court reasoned, in this connection, that if the contractor brought his claim as a breach of contract claim, due to defective specifications, instead of under the Suspension of Work clause, plaintiff would not have to prove that the delay was unreasonable since all delay produced by defective specifications is *per se* unreasonable and compensable. 190 Ct.Cl. at 707, 421 F.2d at 731. Further, the *Chaney* court held that "the fact that the claim was brought [instead] under a contract clause does not affect the reasonableness of delay." *Id.* Since the delay at the basis of either the breach suit or the claim under the contract clause flowed from erroneous specifications, the court reasoned that its character would not be changed—and it would remain unreasonable under either type of claim. *Id.*

The reasoning in *Chaney* is clearly supported by the well-recognized rule fixing responsibility on the government for its specifications. *La Crosse Garment Mfg. Co. v. United States*, 193 Ct.Cl. 168, 180, 432 F.2d 1377, 1385 (1970). With regard to the foregoing, courts have held that government contracts include an implied warranty that performance will be satisfactory if the contractor follows the specifications. *Id.* Consequently, the government has been held liable, in breach of contract, for the cost increases occasioned by such defective specifications. *Id.*, citing *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

In *La Crosse Garment Mfg. Co.*, the court restated the rule that the government is liable to compensate the contractor for increased costs due to delay caused by defective specifications as follows:

> "The defendant cannot, by errors in the specifications, cause delay in plaintiff's completion of the work and then compensate plaintiff *merely* by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors."

*Id.*, quoting *Laburnum Constr. Corp. v. United States*, 163 Ct.Cl. 339, 350, 325 F.2d 451, 457–58 (1963) (emphasis added). Finally, as a measure of the time comprising the delay, the court follows the rule that the delay embraces the period from the discovery of the defect in specifications to the time that the order to proceed with correction was issued. *J.A. Ross & Co. v. United States*, 126 Ct. Cl. 323, 115 F.Supp. 187 (1953). Given the foregoing, as a matter of law then, Beauchamp has met its burden on showing that the delay occasioned by the defective specifications was directly attributable to defendant and was unreasonable.

Now, as to damages, the court in *La Crosse Garment Mfg. Co.*, recognizing the entitlement to compensation for partial delay, set the measure of damages as the degree of interference with satisfactory performance. 193 Ct.Cl. at 180, 432 F.2d at 1385. However, in *Chaney*, the court inferred the existence of delay damages from the extent and nature of the additional work that plaintiff was required to perform as a result of changes to the specifications. *Chaney*, 190 Ct.Cl. at 711, 421 F.2d at 735. Plaintiff would then have to prove the quantum of damages. *Id.*

In the case at bar, the parties agree that the original specifications did not include demucking and that the specifications had to be changed to include this additional work. The parties also agree that certain aspects of the construction of buildings 10c and 12 were postponed until the demucking was completed. This postponement of progress under the original contract would necessarily include the time prior to authorization of the demucking work since plaintiff could not proceed until it received the authorization to remove the differing site condition. The court finds, therefore, that on the record before it there is specific evidence of interference with the progress in a part of the contract performance caused by the admitted differing site condition and the resulting and subsequent 83–day delay on defendant's part in issuing Modification No. 4. The court, on these facts, can and does reasonably infer the existence of compensable delay damages to Beauchamp as a result of the unjustified interruption of performance. With respect to the precise amount of the entitlement, plaintiff will have ample opportunity to quantify its damages by appropriate evidence at a forthcoming trial.

**D. Concurrent Delays**

As explained above, any concurrent causes for the delay bar plaintiff's recovery under the Suspension of Work clause. Accordingly, defendant has raised the doctrine of concurrent delays as a material issue of fact that would preclude the granting of plaintiff's motion. The court finds that while concurrent delay may be a relevant issue in light of the requirements of the Suspension of Work clause, in this case and at this posture it is not a genuine issue. Defendant points to *no* concurrent delays that arose during the 83 days prior to the issuance of the authorization to proceed. Moreover, by paying plaintiff $16,-489.49 in indirect costs for the 54–day peri-

**440**

od during which the demucking work was being performed, defendant, by such action, tacitly admitted the absence of concurrent causes during this time frame. In an attempt to posture a viable concurrent delay, defendant seeks to characterize the time that plaintiff used to respond to the request for a cost proposal for the demucking work as such a delay on plaintiff's part. The court finds this hospitable characterization to be without merit. This is so because plaintiff responded thereto within a reasonable time given the scope and the complexity of the request. Further, as stated above, the entire period from the discovery of the defect in the specifications (*i.e.*, the differing site condition) to the issuance of the authorization to proceed with correction is a *per se* unreasonable delay. In fact, the alleged genuine concurrent delays specified by defendant occurred *after* performance of the demucking had begun (*i.e.*, January 6, 1984) or after the demucking was complete (*i.e.*, March 1, 1984). Thus, we are compelled to find that said factual issue lacks genuineness since on the record presented no reasonable jury could resolve the factual issue of concurrent delays in favor of defendant, the non-movant.

## VI. *Conclusion*

As a result of our findings above, the court holds that no genuine issue of material fact presents itself on this record. Since plaintiff has met its burden under the Suspension of Work clause and defendant has conceded delay costs under the Differing Site Condition clause, plaintiff is entitled to judgment on liability as a matter of law. Hence, we grant plaintiff's motion for partial summary judgment. Because the issues of threshold liability and damages were bifurcated, the court hereby sets the following schedule for the remaining proceedings regarding the quantum of damages in this case:

(1) The parties shall have until April 22, 1988, for concurrent discovery;

(2) Plaintiff's pretrial submission of a memorandum of law in which it postures the issues and details the applicable law shall be filed on April 25, 1988;

(3) Defendant's response to plaintiff's pretrial submission shall be filed on May 9, 1988;

(4) Plaintiff's reply thereto shall be filed on May 16, 1988;

(5) A pretrial conference shall be held in this court on Wednesday, May 18, 1988, at 10:00 a.m.; and

(6) Unless the parties stipulate to a different situs, trial on the quantum of damages shall commence on Wednesday, June 1, 1988, at 9:30 a.m., in Miami, Florida. The court will inform the parties of the exact location at a later date.

The parties are advised that the court will *strictly* adhere to the foregoing schedule.

No costs.

IT IS SO ORDERED.